98

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 5 2003

Michael M. Milby
Clerk of Court

| | | |
|---|---|---|
| SEABULK TOWING, INC., f/k/a | § | |
| HVIDE MARINE TOWING, INC., | § | |
| and SEABULK OFFSHORE, LTD. | § | |
| Plaintiffs | § | CIVIL ACTION NO. B-01-094 |
| | § | |
| V. | § | In Admiralty |
| | § | |
| OCEANOGRAFIA S.A. de C.V. and | § | |
| AMADO YANEZ OSUNA | § | |
| Defendants | § | |

PLAINTIFFS' SUPPLEMENTAL RESPONSE TO OPPOSITION
TO MOTION FOR LEAVE TO AMEND COMPLAINT

TO THE HONORABLE UNITED STATES JUDGE FOR THE
SOUTHERN DISTRICT OF TEXAS, BROWNSVILLE DIVISION:

COME NOW Plaintiffs, Seabulk Towing, Inc. and Seabulk Offshore, Ltd., and

supplements their reply to Defendants' response to Plaintiffs' Motion for Leave to File Amended

Complaint, as follows:

I.

AVAILABILITY OF DOCUMENTS

Oceanografia and Yanez should not be heard to complain that the amendment comes too

late in this proceeding. Oceanografia has had the general ledger for Seabulk Offshore, Ltd.

which accounts for all of the transactions incorporated in Seabulk's Third Amended Complaint

since August 22, 2002. Oceanografia has had all of the documents, including the invoices in

Exhibits A, B, C, D, E and F since January 14, 2003. Oceanografia has not conducted any

additional discovery, instead choosing to oppose Seabulk's Motion for Leave to try to diminish

Seabulk's legitimate claims.

## II.

## JOINT VENTURE AGREEMENT

As explained at the hearing, Seabulk Towing, Inc., which had a previous business relationship with Oceanografia, entered into a joint-venture agreement with Oceanografia to provide management services. This Mexican corporation, Seabulk Offshore de Mexico, S.A. de C.V. (SODM) was owned 49% by Seabulk Towing and 51% by Oceanografia. Oceanografia then contracted with SODM to act as Oceanografia's agent to provide management services to vessels chartered by Oceanografia. Attached is a copy of a prototype management agreement whereby SODM was to act as Oceanografia's agent (Exhibit 1). Oceanografia was to pay SODM the time-charter revenue less the bareboat charter hire due Seabulk Offshore and Oceanografia's commission. However, Oceanografia did not pay SODM the time charter revenue, so Seabulk Offshore, the owner, made advances for crew wages and travel expenses, parts, repairs and other necessaries for which it now sues.

## III.

## NO CHANGE IN CHARACTERIZATION

Oceanografia and Yanez oppose Seabulk's Motion for Leave to Amend on the basis that the description of advances and expenses claimed has significantly altered. Specifically, Oceanografia and Yanez claim that the description of advances in the Second Amended verified Complaint stating, "joint venture expenses advanced by Seabulk to the joint venture have remained unpaid by Oceanografia..." (Seabulk's Second Amended Verified Complaint) is somehow different from the statement of Seabulk's Third Amended Verified Complaint which states, "Pursuant to the advances clauses in the bareboat charters, Seabulk made advances to the vessels for necessaries..." and, "Expenses (payroll and third-party expenses) advanced by

Seabulk Offshore to the vessels on behalf of Oceanografia have remained unpaid by Oceanografia... ."

In fact, there is no difference. The joint venture was Oceanografia's agent charged with the responsibility to pay expenses which Oceanografia was liable for under the charter parties including expenses for maintenance and repair, crew wages and travel expense, insurance (which was later changed) and miscellaneous vessel related expenses. Oceanografia remained responsible for the expenses of the vessels under the bareboat charter. SODM had no expenses except the expenses of Oceanografia as its agent. In either case, whether Seabulk expresses its advances as joint venture expenses advanced to the joint venture or advances to the vessels under the bareboat charters, Oceanografia is liable for 100% of the expenses, not its 51% interest in SODM. SODM had no expenses other than bareboat charter expenses for which Oceanografia was liable and which Oceanografia delegated the payment responsibility to SODM. SODM had no revenue to defray expenses submitted to them as agent for Oceanografia.

. IV.

### NO PREJUDICE

Consequently, the grant or denial of Seabulk's Motion for Leave to File its Third Amended Verified Complaint will not prejudice Oceanografia by depriving it of any defense that it is only liable for its proportionate share of the expenses.

Additionally, Seabulk's claims for expenses incurred in 2001 and 2002, not included in the Second Amended Verified Complaint are not barred by laches or the analogous statute of limitations. Therefore, if the Court denies the Motion for Leave, Seabulk may include those amounts, which it now seeks to include in its Third Amended Verified Complaint in a separate action against Oceanografia and Amado Yanez Osuna.

Seabulk respectfully requests the Court grant its Motion for Leave to File its Third Amended Verified Complaint.

Respectfully submitted,

THE KLEBERG LAW FIRM

_____

Frank L. McNiff,  Jr.
State Bar No. 07419100
Federal ID No. 12595
James F. Buchanan
State Bar No. 03287500
Federal ID No. 0328
800 N. Shoreline Blvd., Suite 900 North
Corpus Christi, Texas  78401
(361) 693-8500 Telephone
(361) 693-8600 Fax

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was forwarded to the attorney listed below by hand delivery, facsimile or U. S. certified mail, return receipt requested on the 24th day of February, 2003

Keith N. Uhles
James H. Hunter, Jr.
ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
55 Cove Circle
P. O. Box 3509
Brownsville, Texas  78523-3509

Rufus C. Harris III
Alfred J. Rufty III
HARRIS & RUFTY, L.L.C.
1450 Poydras St., Suite 1510
New Orleans, LA 70112

_____
Frank L. McNiff, Jr.

173735                                    4

## VESSEL MANAGEMENT AGREEMENT

This Agreement is made this _____ day of July __31__, 1998, between Seabulk Offshore de Mexico, S.A. de C.V., a Mexican corporation (the "Manager") and Oceanografia, S.A. de C.V., a Mexican corporation (the "Charterer").

## WITNESSETH:

WHEREAS, the Charterer has entered into a Bareboat Charter Agreement with Seabulk Carolyn, Inc. ("Owner"), dated July __31__, 1998 (the "Charter"), for the charter of the M/V SEABULK CAROLYN, a Marshall Islands flagged stern-drive tractor tug of 408 gross tons, 122 net tons, Official Number 1283 (the "Vessel");

WHEREAS, pursuant to the Charter, the Charterer has undertaken certain obligations with respect to the Vessel and the Charterer wishes to engage the Manager to provide certain technical and marine, crewing and insurance, and administrative services as more particularly described in this Agreement and to assist the Charterer in the operation of the Vessel; and

WHEREAS, the Manager has the ability and desire to provide such services.

NOW THEREFORE, in consideration of the foregoing, the parties hereto agree as follows, intending to be legally bound:

### ARTICLE 1 - ENGAGEMENT AND COMPENSATION

1.1   The Charterer hereby engages the Manager as the Charterer's agent, and the Manager hereby accepts such engagement, to provide to and on behalf of the Charterer with respect to the Vessel the services covered by this Agreement (the "Services"). In addition to matters specifically described herein, the Services shall include, in general, performing for the Charterer all matters that are the responsibility of the Charterer under the Charter (subject to the approval of Charterer and Owner, when applicable) and at any time the Vessel is under a time charter by the Charterer, all matters that are the responsibility of the Charterer under such time charter.

1.2   Subject to compliance with the Standard of Performance required by Article 2 of this Agreement, the Manager is entitled to carry out its duties under the terms of this Agreement at its own discretion and at the cost of the Charterer, and to employ or engage any superintendent, surveyor, expert, consultant or agent the Manager may deem necessary or expedient for proper performance of the Services, but subject to an overall right of review and direction by the Charterer and the Owner.

1.3   As compensation for providing the Services, the Charterer shall pay to the Manager a fee (the "Fee") in the amount equal to 100% of any time charter hire received by the Charterer under any time charter of the Vessel after deduction of amounts payable to Owner and authorized distributions to Charterer made pursuant to Articles 3 and 5 of the Charter. The Fee shall be payable immediately following the above deductions and authorized distributions

PRICAD-Raymon, N.J.

EXHIBIT

1

by transferring the balance remaining in Charterer's lock-box account following such payments to Manager's designated account.

## ARTICLE 2 - STANDARD OF PERFORMANCE

2. 1    The Manager shall provide the Services to and on behalf of the Charterer and the Vessel in accordance with the best ship management practice customary in the trade for vessels of the type.

2.2    In the exercise of its duties hereunder the Manager shall act fully in accordance with the policies, guidelines and instructions from time to time communicated to it by the Charterer and serve the Charterer faithfully and diligently, at all times maintaining confidentiality in respect of business secrets.

2.3    The Manager shall, at its own expense, provide all office accommodation, office equipment, office stationery and office staff as required to provide the Services in an efficient and economic manner.

## ARTICLE 3 - TECHNICAL AND MARINE OPERATIONS SERVICES

3.1    The Manager shall provide with respect to the Vessel the services described in this Article 3. To facilitate the performance of such services, the Charterer shall provide the Manager with all technical information in the form of drawings, instruction books and manuals, lists of spare parts and accessories, and similar data pertaining to the Vessel, in the possession of the Charterer.

3.2    The Manager shall provide to the Charterer the following services with respect to the marine operations of the Vessel:

(a)    Monitoring, evaluating and providing supervision to assure that the Vessel is equipped to maintain trading certificates and be in accordance with applicable statutory requirements of the Marshall Islands and Mexico, as well as applicable international rules;

(b)    Supervising marine operations and arrange lay berths as required;

(c)    Arranging for assistance and support to the Vessel in case of emergencies;

(d)    Providing supervision with respect to statutes and international conventions relating to pollution;

(e)    Undertaking such measures as are reasonably necessary to prevent or mitigate damages when an escape or discharge of oil or other substance from the Vessel occurs or threatens to occur and causes or threatens to cause pollution damage; and

- 2 -

(f)    Providing such other services as may be necessary to the effective operation of the Vessel.

3.3    The Manager shall provide the following services for the maintenance and repair of the Vessel:

(a)    Arranging for both voyage and periodic shoreside maintenance and repair of the Vessel's: hull; water, fuel, ballast, and other tank(s) and void spaces: deck equipment; engines; electrical, navigational and communication systems; accommodations; and any other systems, equipment or appurtenances of the Vessel as may be necessary to keep the Vessel in seaworthy condition, to maintain the Vessel's class, to maintain any applicable inspection certificates, and to comply with the required standard of the general up-keep of the Vessel as set forth in Article 2 above;

(b)    Providing scheduling of drydockings for consideration and agreement of the Charterer and the Owner;

(c)    Preparing maintenance and repair and/or drydocking work specifications, evaluating tenders, conducting yard negotiations, acting as the Charterer's representative and supervisor during shoreside maintenance and repair and/or drydocking, handling damage repair and general average in cooperation with insurance company and brokers, controlling and approving maintenance and repair and/or drydocking accounts;

(d)    Monitoring engine performance and maintaining overall oversight of the Vessel's performance, and arranging corrective measures when found necessary;

(e)    Supervising the inventory and supply of deck, engine and electrical stores and spares to the Vessel, including ordering ship's provisions, stores and spares on terms negotiated by the Manager and forwarding them to the Vessel;

(f)    Providing operational statistics as required by the Charterer and the Owner;

(g)    Taking all such actions that may be required of the Owner under the contract governing construction of the Vessel following delivery of the Vessel to the Owner thereunder in relation to the builder's warranty or guarantee of materials and workmanship, including giving notices on behalf of the Owner thereunder and requesting and arranging for reimbursement of the builder for sums payable by Owner for services in accordance with the shipbuilding contract; and

(h)   Arranging for the supply of bunkers whenever necessary on terms negotiated by the Manager in accordance with minimum fuel specifications furnished by the Charterer.

3.4   The Charterer and the Manager shall agree in detail on minimum specification of fuels to be supplied to the Vessel.   The Manager shall have the right to reject any fuel not meeting the agreed specification.

3.5   Unless expressly instructed otherwise in writing (but subject to and in conformity with the annual budget prepared by the Manager and approved by the Charterer), the Manager shall on behalf of the Charterer enter into, carry and terminate at its discretion, contracts for stores, lubrication oils, equipment, parts, and any other technical services to the Vessel as the Manager shall consider reasonable and desirable for the cost-efficient operation of the Vessel.

3.6   Manager's costs incurred in providing the services and satisfying its duties under this Article 3 shall be included in and funded from the Fee to be paid to Manager pursuant to Section 1.3 of this Agreement.

## ARTICLE 4 - CREWING SERVICES

The Manager shall act as the Charterer's manning agent for the Vessel and in this connection shall provide the following services:

(a)   Ensuring that the Vessel is always properly manned (with properly licensed masters, mates, engineers and other crew) in accordance with good marine practice and the requirements of the Marshall Islands and Mexican law;

(b)   Arranging and paying for all matters pertaining to transportation (including repatriation), training, discipline, welfare and amenities for officers and crew and implementing the Charterer's and the Owner's instructions with respect to such matters; and

(c)   Paying wages, fringe benefits, and all other payments related to the Vessel's personnel, including but not limited to, social costs, traveling and accommodation expenses, preparing payrolls for the Vessel's complement, and preparing, filing and paying, all reports, returns and payments for payroll taxes, F.I.C.A. (or equivalent), and benefit payments which are based on such payroll.

4.2   The Manager may engage a crewing manager for the Vessel; provided, however, such crewing manager shall not be entitled to sub-contract the performance of its services and the Manager shall remain fully responsible for the performance of its obligations hereunder.

4.3   Manager's costs incurred in providing the services and satisfying its duties under this Article 4 shall be included in and funded from the Fee to be paid to Manager pursuant to Section 1.3 of this Agreement.

## ARTICLE 5 - INSURANCE SERVICES

5.1    Under the terms of the Charter, the Vessel will remain a scheduled vessel under the insurance coverages of Owner, or Owner will otherwise procure insurance coverages on the Vessel meeting the requirements of the Charter. Under the Charter, all such insurance shall be at the cost of Charterer notwithstanding that the insurance shall be procured and maintained by Owner. Manager shall pay to Owner, on behalf of Charterer, the annual premiums for insurance placed on the Vessel in twelve (12) equal monthly installments, and shall pay to the order of Owner, on demand, any club calls, co-payments, deductibles, commissions and other fees and charges payable by or on account of Charterer with respect to such insurance. All such payments shall be included in and funded from the Fee to be paid to Manager pursuant to Section 1.3 of this Agreement..

5.2    As required by the Charter, such insurance shall name as assureds the Owner and the Charterer and such other persons as the Owner and the Charterer may direct and shall include all necessary and customary insurance of the Vessel and the crew including in particular insurance for hull and machinery against usual marine and war risks in accordance with accepted insurance practice. Copies of the policies shall be made available to the Owner and the Charterer, as shall copies of all endorsements or variations issued by the insurers or their agents from time to time.

5.3    The Manager shall provide claims handling services for the Charterer and the Vessel for insurance, average (particular and general), salvage and other claims covered by insurance or within the deductible or franchise of any insurance (but excluding cargo claims). The Manager may appoint at its own discretion, average adjusters and other professional advisers when such services are appropriate.

5.4    The Manager shall forthwith communicate to the Charterer and the Owner any event, claim or occurrence affecting the Vessel or its personnel which is thought likely by the Manager to exceed $25,000 in aggregate claims or any single claim.

## ARTICLE 6 - REPORTS; BUDGETS

6.1    The Manager shall provide the Charterer and the Owner with periodic reports on the technical performance of the Vessel, including reports of fuel consumption and technical problems encountered by the Vessel in operation.

6.2    At least thirty (30) days before the first day of each calendar quarter, the Manager shall provide to the Charterer and Owner, a budget estimate for the Services to be provided in such quarter. If any such quarterly budget estimate shall deviate from the current annual budget as adopted, the Manager shall give the Charterer and Owner as much advance notice of any deviation as circumstances permit, so as to give the Charterer and Owner sufficient time to adopt a revised annual budget.

## ARTICLE 7 - MISCELLANEOUS VESSEL EXPENSES

7.1    In addition to the Services provided above, the Manager shall pay on behalf of Charterer:

(a)    expenses related to repatriation or otherwise incurred in dealing with stowaways and refugees;

(b)    costs and expenses incurred to third parties in relation to (i) maintenance, repair and drydocking of the Vessel; (ii) fees for permits, customs or in any way arising out of operation and navigation of the Vessel; (iii) the purchase, forwarding, storing or warehousing of equipment, spares, stores for the Vessel; (iv) lubrication oils, (v) victualing; (vi) salvage; (vii) insurance premiums, calls, supplemental calls, brokers' commissions; (viii) amounts within the deductible or franchise of insurance policies, or for any reason not covered by the policies, for claims against or relating to the Vessel, to the extent such amounts have been paid or, in a proper case, are accrued; (ix) general average (to the extent, if any, not covered by insurance), and (x) posting a bond (and related security) in the event of the arrest of the Vessel;

(c)    fines, penalties or other payments imposed for breach by the Vessel of port regulations, environmental ordinances and national or international statutes or regulations;

(d)    travel, subsistence, and accommodation expenses of the Manager's employees incurred in connection with the performance of Services; and

(e)    fees and expenses of third party experts engaged by the Manager to attend to the Vessel as necessary for the proper performance of the Services.

7.2    All payments to be made by Manager on behalf of Charterer under this Article 7 shall be included in and funded from the Fee to be paid to Manager pursuant to Section 1.3 of this Agreement.

## ARTICLE 8 - DISCOUNTS

8.1    Any discounts obtained by the Manager in connection with the purchase of supplies, stores or services for or to the Vessel, and otherwise in connection with performance of the Services shall be for the account of the Manager.

## ARTICLE 9 - TERM OF AGREEMENT

9.1    This Agreement shall be effective on the date hereof and shall continue in effect until terminated as provided in this Article 9.

9.2    This Agreement may be terminated by the Charterer giving notice to the Manager upon the occurrence of any of the following events:

- 6 -



(a)    there is a material breach of a material term of this Agreement by the Manager which is not remedied within ten (10) days after notice and demand for remedy has been given by the Charterer to the Manager; or

(b)    the Bankruptcy of the Manager.

9.3    This Agreement may be terminated by the Manager giving notice to the Charterer and Owner upon the occurrence of any of the following events:

(a)    there is a material breach of a material term of this Agreement by the Charterer which is not remedied within ten (10) days after notice and demand for remedy has been given by the Manager to the Charterer;

(b)    the Bankruptcy of the Charterer;

(c)    Charterer shall lose its time-charter with Pemex covering the hire of the Vessel or such charter shall otherwise terminate without renewal or replacement.

9.4    This Agreement may be terminated by either party giving written notice to the other party if the Vessel is sold or otherwise disposed of, or becomes an actual or constructive or compromised or arranged total loss, or is requisitioned for title or is forcibly or compulsorily acquired by any government authority, or for any reason the Vessel ceases to be subject to the control of the Charterer (and each party hereby agrees to give written notice to the other party forthwith should any such event occur).

9.5    Any termination of the Agreement shall be without prejudice to the rights of either party hereunder with respect to periods prior to such termination.

9.6    Anything contained herein to the contrary notwithstanding, except for a termination of this Agreement in accordance with Section 9.4 hereof, termination of this Agreement shall not become effective during any time charter in progress on the date thereof until the Vessel completes such charter.

## ARTICLE 10 - INDEMNITY

10.1    Except as provided in Section 10.2 below, neither the Manager nor any officer, director, shareholder or employee of the Manager shall be liable to the Charterer or to any officer, manager, member or employee of the Charterer or to any other third party, including any master, officer or crewmember employed on the Vessel or in connection therewith, for any loss or damage arising directly or indirectly out of the performance by the Manager of any of its obligations under this Agreement, and the Charterer shall indemnify and hold harmless and defend the Manager, its officers, directors, shareholders and employees against any and all claims and demands (including costs and reasonable attorney's fees of defending such claim or demand, whether or not the claim or demand be found to be valid) of whatsoever kind or nature

- 7 -

and by whomsoever asserted, for injury to persons or property and any other losses or liabilities arising directly or indirectly out of the performance by the Manager of any of its duties under this Agreement.

10.2    The Manager shall only be liable to the Charterer or to any third party, including any master, officer or crewmember employed on the Vessel or in connection therewith, if and to the extent the Manager was grossly negligent or willfully misconducted itself in the performance of its duties under this Agreement.

10.3    The Charterer shall indemnify and hold the Manager harmless against any and all liabilities and expenses reasonably incurred by the Manager in winding up its agency operations hereunder because of any termination of this Agreement, including but not limited to any claims which may be directed against the Manager by the master, officer or crew of the Vessel or by any maritime union or union benefit fund in respect of any contractual obligations undertaken with the Charterer's knowledge and consent that will not be fulfilled as a direct consequence of such termination; provided, however, the Charterer shall have no obligation under this Section 10.3 if this Agreement shall be terminated as a result of a written notice duly given by the Charterer pursuant to Section 9.2 hereof.  The Manager shall use its best efforts to minimize such liabilities and expenses, and shall provide the Charterer with an estimate of such liabilities and expenses within thirty (30) days of receiving notice from the Charterer of any event which would result in any termination of this Agreement.

## ARTICLE 11 - MODIFICATION OF AGREEMENT

11.1    No modification or any future representation, promise or agreement in connection with subject matter under this Agreement shall be binding, unless made in writing and signed on behalf of each party by its duly authorized officer or representative.

## ARTICLE 12 - REPRESENTATIONS AND WARRANTIES

12.1    Each party represents and warrants on its behalf to and for the benefit of each other party:

(a)    It is a legal entity established, duly organized and in good standing under the laws of Mexico;

(b)    The execution, delivery and performance of this Agreement and any instrument or agreement required to be executed, delivered or performed by it hereunder are within its powers, have been duly authorized and are not in conflict with its organizational documents or of any other instruments or agreements to which it is bound, and the person or persons executing this Agreement or any such other instrument or agreement on its behalf has been fully authorized to do so;



(c)     There is no law, rule or regulation, nor is there any judgment, decree or order of any court or governmental authority binding on it, nor is there any agreement to which it is bound, which would be contravened by its execution, delivery or performance of this Agreement;

(d)     This Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms except as limited by bankruptcy, insolvency or other similar laws; and

(e)     Any necessary permits, licenses and approvals required under the laws of the place of its formation and its principal place of business for the execution, delivery and performance of this Agreement by it, have been properly obtained and are presently in full force and effect.

## ARTICLE 13 - ASSIGNABILITY

This Agreement may not be assigned by either party in whole or in part without the prior written consent of the other.

## ARTICLE 14 - FORCE MAJEURE

14.1     Neither party shall be liable to the other for loss or damage resulting from delay or failure to perform this Agreement, or any contract hereunder, either in whole or in part, when any such delay or failure shall be due to causes beyond its control or is not occasioned by its fault or negligence, including, but not limited to, civil war, insurrections, strikes, riots, fires, floods, explosions, earthquakes, serious accidents, or any act of government, governmental priorities, allocations, regulations or orders affecting materials, facilities, acts of God or failure of transportation, epidemics, quarantine restrictions or labor trouble causing cessation, slowdown or interruption of work.

14.2     In the event that a situation giving rise to force majeure which prevents the Manager from performing under this Agreement, the parties agree that the Charterer may in good faith obtain substitute performance; provided, however, if such situation continues for a period longer than three (3) months, then the Charterer shall be entitled to terminate this Agreement by giving one (1) month prior notice in writing.

## ARTICLE 15 - GOVERNING LAW

15.1     This Agreement has been executed and is deemed to be made under and shall be construed according to laws applicable to contracts of a similar kind made and to be performed wholly within the United States of Mexico.

- 9 -

## ARTICLE 16 - CONSENT OF JURISDICTION

16.1   Any disputes as to rights or duties of the parties hereto, or of any person claiming rights hereunder, may only be brought in the state courts or the courts of the United States of America in the state of Florida.  Each party hereby irrevocably waives any present or future objection to such venue, and each for itself and in respect of any of its property, hereby irrevocably consents and submits unconditionally to the exclusive jurisdiction of those courts. The parties further irrevocably waive any claim that any such court is not a convenient forum for any such proceeding.  Charterer agrees that any service of process, writ, judgment or other notice of legal process shall be deemed and held in every respect to be effectively served upon it in connection with such proceedings, if delivered to CT Corporation System, 660 East Jefferson Street, Tallahassee, Florida 32301, which it irrevocably designates and appoints as its authorized agent for the service of process.  Each party further agrees that final judgment against it in any such action or proceeding arising out of or relating to this Agreement shall be conclusive and may be enforced in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of that fact and of the judgment.

## ARTICLE 17 - NOTICES

17.1   Unless otherwise specified in this Agreement, all notices, demands, elections, requests or other communications that any party to this Agreement may desire or be required to give hereunder shall be in writing and shall be given by hand delivery, or by telecopy or other written form of electronic transmission, or by express mail postage prepaid, or by Federal Express or other reputable courier service, to the addressee at the address for notice purposes as provided below or at such other address as either party may from time to time designate in writing to the other party. Any notice so given shall  be conclusively deemed to be received when so delivered by hand, or if sent by express mail or by Federal Express or other reputable courier service, on the date received; or if sent by telecopy or electronically, when an answer back or transmittal confirmation report (TCR) is printed showing transmission to the telecopy or electronic address to which sent provided, however, that if such receipt, answer back, transmittal, or TCR printing does not occur on a business day in the jurisdiction within which the address to which the notice was sent is located, on the next following business day. The address for notices of the respective parties is as follows:

If to the Charterer:

Calle 26-A López Mateos Mza. D Lote 2-A
Parque Ind. Pesq. Laguna Azul
42120 Cd. del Carmen, Campeche
México
Attention:  Ing. Amado Yañez Osuna
Facsimile:  011-52-938-26107

- 10 -

If to the Manager:

Facsimile:

With a copy to Owner:

Seabulk Carolyn, Inc.
c/o Hvide Marine Incorporated
2200 Eller Drive
P. O. Box 13038
Ft. Lauderdale, FL  33316
Attention:  Mr. Eugene Sweeney

Facsimile:  954-527-1772

## ARTICLE 18 – COUNTERPARTS: TRANSLATIONS

18.1    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute but one and the same instrument.

18.2    This Agreement is executed and delivered in the English language.  Should this Agreement be translated into Spanish for any reason whatsoever, including, without limitation, for filing, recordation or registration with any government agency, any dispute between Owner and Charterer hereunder shall be resolved on the basis of the English text of this Agreement, notwithstanding the fact that Owner may have executed one or more counterparts translated to Spanish.

- 11 -

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto in counterparts, each of which to be considered a complete original, on the day and year first above written by their respective officers or agents thereunto duly authorized.

WITNESSES:

_____

_____

CHARTERER:
OCEANOGRAFÍA, S.A. de C.V.

By: _____
Name: Amado Yáñez Osuna
Title: Director General

WITNESSES:

_____

_____

MANAGER:
SEABULK OFFSHORE de MEXICO, S.A. de C.V.

By: _____
Name: _____
Title: _____